UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**VALENTINE GE,**

**Plaintiff,**

**v.**                                                              **Case No:  6:15-cv-1029-Orl-41GJK**

**DUN & BRADSTREET, INC.,**

**Defendant.**

_____/

**ORDER**

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 32). Plaintiff filed a Response (Doc. 49), to which Defendant filed a Reply (Doc. 54). This cause is also before the Court on Defendant's Motion in Limine (Doc. 56) and Plaintiff's Response (Doc. 59). For the reasons stated below, Defendant's Motion for Summary Judgment will be granted, and the Motion in Limine will be denied as moot.

**I.      BACKGROUND**

Plaintiff, Valentine Ge, is a post-operative transgender female, who was formerly known as Thomas Gersbach, a male.[1] (Pl.'s Dep., Doc. 52-4, at 8:21–22, 10:12–25). Plaintiff had two sexual reassignment surgeries to complete her transition to a female, one in December 2014 and the other in April 2015. (*Id.* at 291:18–21, 292:13–15). Plaintiff has worked in the commercial insurance industry for more than twenty-eight years. She was first employed by Defendant Dun & Bradstreet, Inc., as a Managing Director of the Insurance Vertical from January 2000 to December 2007 but was laid off after her position was eliminated. (*Id.* at 22:14, 23:9–11, 25:13–24). In early

---

[1] Plaintiff will be referred to as a female throughout this Order.

2012, Plaintiff was rehired by Defendant to serve in a sales position. (*Id.* at 33:14–22). Amy Hutchison was Plaintiff's direct supervisor from the time Plaintiff was hired in 2012 until her termination in 2014. (*Id.* at 57:17–22). Hutchison and Plaintiff have been friends for approximately fifteen years. (*Id.* at 179:14). After being rehired to work for Defendant, Plaintiff worked from home but traveled extensively. (*Id.* at 56:19–57:6, 272:3–8). Plaintiff reported to Defendant's Naperville, Illinois office—where Hutchison worked—but Plaintiff only visited that office two to three times per year. (*Id.* at 57:5–16, 57:23–25). Plaintiff met with Hutchsion in-person approximately six times per year, so they primarily communicated via phone and e-mail. (*Id.* at 59:5–9; Hutchison Dep., Doc. 52-6, at 31:1–5).

In 2012, Hutchison requested a 12.5% salary increase for Plaintiff due to her vast insurance experience and significant contributions to Defendant, (*see* May 3, 2012 E-mail, Doc. 51-6), received positive feedback about Plaintiff, (*see* Sept. 25, 2012 E-mail, Doc. 51-7), and gave Plaintiff positive reviews, (*see* Year-End Review 2012, Doc. 51-4; Mid-Year Review 2012, Doc. 51-8). Plaintiff received mainly "G2" and "G3" ratings on both her mid-year and year-end review for 2012. (Doc. 51-4 at 1–2; Doc. 51-8 at 1–2).[2] While the salary increase that Hutchison requested for Plaintiff was denied, Plaintiff was awarded a one-time bonus of $7,500, a monthly stipend, and became eligible for a supplemental year-end bonus opportunity. (Sept. 27, 2012 Mem., Doc. 51-9, at 1).

Plaintiff has identified as a woman since she was eight years old. (Doc. 52-4 at 161:20–23). The parties dispute the facts concerning how Hutchison learned that Plaintiff had gender identity issues. (*See id.* at 83:1–5, 86:16–18, 87:4–22; Doc. 52-6 at 51:9–52:8). Nevertheless, it is

---

[2] A "G2" rating means the employee has exceeded expectations, a "G3" rating means the employee has met expectations, and a "G4" rating means the employee has not met expectations. (Doc. 52-6 at 45:14–16).

undisputed that Hutchison discovered that Plaintiff was struggling with her gender identity and that Plaintiff became aware that Hutchison knew Plaintiff identified as a woman around February 2013. (March 14, 2014 E-mail, Doc. 51-11, at 1; Doc. 52-4 at 160:20–161:4, 162:8–10, 175:14–19). On February 6, 2013, Plaintiff and Hutchison engaged in a brief e-mail exchange where Plaintiff expressed that it was a relief for Hutchison to know what she was going through and asked Hutchison to thank her spouse, Robin, who was a guidance counselor and counseled Plaintiff regarding her gender identity issues. (Doc. 51-11 at 2; Doc. 52-4 at 81:1–2, 81:5–6). Hutchison replied by ensuring Plaintiff that she had Hutchison's support. (Doc. 51-11 at 1).

During the next several months, Hutchison grew to be concerned about Plaintiff's behaviors, and as a result, in April 2013, Hutchison informed her supervisor, Erik Frank, that she had "started documenting everything." (Apr. 19, 2013 E-mail, Doc. 51-13; *see also* Tom Gersbach Notes, Doc. 51-12). For example, Hutchison noted that on February 4, 2013, she learned that Plaintiff was struggling with her sexual and gender identity and had been taking female hormones for a period of time. (Doc. 51-12 at 1). Hutchison also noted that Plaintiff sporadically signed work e-mails as "Tomi." (*Id.*). According to Plaintiff, once she began transitioning to a female, she occasionally used the more feminine version of her name, "Tomi." (Doc. 52-4 at 128:20–129:5). Hutchison's notes indicate that on April 4, 2013, Hutchison informed Erik Frank that Plaintiff was transgender and shared a series of e-mails sent by Plaintiff that concerned Hutchison due to their unprofessional nature. (*See* Doc. 51-12 at 4; Doc. 52-6 at 63:4–11). Prior to these e-mails, Hutchison had been "unaware of any behaviors or changes that were visible or impacting Tom or other team members at work." (Doc. 51-12 at 4). Hutchison also mentioned that she spoke with Plaintiff about using "Tomi" in work e-mails and "the importance of keeping work related emails of a professional nature." (*Id.*; Doc. 51-13 at 1). On April 10, 2013, Hutchison wrote in her notes

that Plaintiff wore eyeliner to a celebration lunch with a customer and alleged that Plaintiff smelled like alcohol. (Doc. 51-12 at 4). Hutchison's notes also described one of Plaintiff's customer planning sessions held on April 11, 2013. (*Id.* at 5). Hutchison made comments on a presentation that Plaintiff presented, (*id.*), which Plaintiff found humiliating, causing her to leave the room to calm down, (Doc. 52-4 at 112:19–113:2). After the session, Plaintiff admitted to Hutchison that she had acted "defensive[ly] and passionate[ly]." (Gersbach Apr. 22, 2013 E-mail to Hutchison, Doc. 40-1, at 89).

In April 2013, Plaintiff sent numerous emails to Hutchison, which Hutchison felt contained "disparaging, derogatory and unprofessional" language. (*Id.* at 91). Hutchison also voiced concerns about Plaintiff's recent behaviors, such as her treatment of other team members, her "passionate and defensive and inappropriately aggressive" behavior during Plaintiff's customer planning session, and Plaintiff's recent e-mails, texts, and verbal communications, which Hutchison deemed inappropriate. (*Id.* at 90–91). Plaintiff responded, informing Hutchison that her behavior was, in part, due to the fact that she was not getting the necessary customer care support to close deals with large clients. (*Id.* at 89–90). Plaintiff also apologized and stated that she would not repeat the inappropriate behavior and that her "candid" communication style would cease. (*Id.*). Plaintiff continued by expressing her concern that Hutchison's behavior had changed and that Plaintiff felt Hutchison's "public humiliation behavior may be related to [her] knowledge" that Plaintiff was "a gender confused Transsexual on hormones for the last couple of years." (*Id.* at 90).

Hutchison forwarded Plaintiff's reply to Gary Wiklund and Rebecca Bursky in Defendant's Human Resources Department. (*See* Hutchison Apr. 24, 2013 E-mail to Bursky, Wiklund, and Frank, Doc. 41-2, at 55–58). With the assistance of Human Resources, (*see* Doc. 40-1 at 88–89),

Hutchison drafted and sent Plaintiff a response, addressing Plaintiff's concerns. Thereafter, Wiklund and several others spoke with Plaintiff about her allegations against Hutchison. (Doc. 52-4 at 173:9–174:2). Ultimately, Wiklund informed Plaintiff that he had determined that Plaintiff had not been discriminated against by Hutchison. (Wiklund Dep., Doc. 52-11, at 32:19–33:1). Thereafter, Plaintiff expressed her concern to Wiklund that Hutchison was making things difficult for her because she was transgender. (*See* June 19, 2013 E-mail at 1:06 PM, Doc. 51-20, at 1–2; June 19, 2013 E-mail at 4:50 PM, Doc. 51-21, at 1). Specifically, Plaintiff pointed to Hutchison's delay in following up with one of Plaintiff's clients per Plaintiff's request. (*See* Doc. 51-20 at 1). However, Wiklund informed Plaintiff that he was still of the opinion that Plaintiff was not being discriminated against because she was transgender. (*See* Doc. 51-21 at 1–2).

Meanwhile, Plaintiff's 2013 Mid-Year Review indicated that Plaintiff was underperforming. Plaintiff was given a "G4" rating, meaning she did not meet expectations, and a "G3" rating, meaning she met expectations. (*See* Mid-Year Review 2013, Doc. 51-23, at 1–5). Hutchison noted in the review that Plaintiff "had a slow and very disappointing start to the sales year. From a sales quota lens, [s]he had a very small Q1 sales goal ($18k) and failed to achieve it." (*Id.* at 1). She also noted that Plaintiff's sales renewals were multi-year agreements and that Plaintiff's "new business sales results for the first [six] months were $10,000 against an annual objective of $516,000." (*Id.* at 2). Hutchison included a host of comments to illustrate Plaintiff's unsatisfactory performance and areas of weakness. (*See id.*). Finally, Hutchison stated that Plaintiff had "not yet demonstrated that [s]he can create/drive opportunities to close business" and concluded that Plaintiff's "level of sales performance is unacceptable." (*Id.*).

In August 2013, Defendant discovered that Plaintiff was using a picture of herself chained against a wall as her profile picture on Defendant's internal database. (*See* Doc. 41-2 at 87). The

picture was taken in a mock dungeon at a client's office that Plaintiff visited. (Doc. 52-4 at 197:11–198:11). The "dungeon" was a place where visitors were given special gifts of appreciation. (*Id.* at 197:18–21). Nevertheless, Thomas McEvoy, Hutchison's boss and Plaintiff's second level of leadership, discussed with Plaintiff that the picture exhibited a "lack of good judgment" and was "inappropriate for a professional workplace and distasteful." (*Id.* at 196:11–16; Doc. 41-2 at 87). McEvoy requested that Plaintiff remove the picture, and Plaintiff did so promptly. (McEvoy Dep., Doc. 52-8, at 46:16–19).

At the end of the year, Plaintiff again received a poor performance review. Plaintiff received another "G4" rating. (Year-End Review 2013, Doc. 51-24, at 1). Plaintiff failed to close any new business in two out of the four quarters and only closed a total of $15,735 for the year—$500,000 below Plaintiff's 2013 goal. (*Id.* at 2). Hutchison explained in Plaintiff's review that "[m]uch more is expected from Tom in terms of sales results." (*Id.*). Hutchison concluded that "[a]s a result of h[er] lack of sales performance, Tom will remain on a verbal performance warning." (*Id.*).

In March 2014, Plaintiff was offered and accepted the role of Product Specialist, (Doc. 52-4 at 248:22–25), a role that Hutchison and McEvoy felt would better suit Plaintiff's skill set, (Doc. 52-6 at 122:7–21, 123:14–24; Doc. 52-8 at 32:2–33:23). Plaintiff started off well in the Product Specialist position. (Doc. 52-6 at 124:22–125:1). However, on April 25, 2014, Hutchison received feedback from one of Plaintiff's co-workers that Plaintiff had behaved inappropriately at a customer lunch. (*See* Apr. 25, 2014 E-mail, Doc. 51-25; Apr. 11, 2014 E-mail, Doc. 51-26). Plaintiff denied the allegations. (*See* Doc. 52-4 at 224:8–225). After consulting McEvoy and Human Resources about the best way to handle the situation, Hutchison decided to counsel Plaintiff and provided her a written warning, despite Plaintiff's denial. (*See* Doc. 41-2 at 101). The

e-mail notifying Plaintiff that she would be placed on a written warning also warned Plaintiff that if anything similar happened again, Plaintiff would be subject to other disciplinary action, including termination. (*Id.*).

On June 23, 2014, CNA—Plaintiff's largest customer as well as the single largest customer of Defendant, (Doc. 52-4 at 62:10–17, 228:3–5)—requested that Plaintiff be removed from its account, (*id.* at 227:1–228:2; Meadors Dep., Doc. 38-1, at 45:3–11, 48:15–21, 49:12–16; *see also* June 25, 2014 E-mail, Doc. 51-28). CNA's request stemmed from concerns that Plaintiff was not familiar with the CNA account, (Doc. 38-1 at 12:7–11, 26:11–16, 35:19–23; *see* Doc. 52-6 at 139:19–140:5, 140:21–142:24), as well as concerns regarding Plaintiff's communication style, (Doc. 38-1 at 12:2–3, 28:8–16; Schram Dep., Doc. 39-1, at 19:17–20), inappropriate jokes, (Doc. 39-1 at 30:10–15), and internal complaints from CNA employees about Plaintiff, (Doc. 38-1 at 12:4–6, 52:17–21). (*See generally* Doc. 51-28). When CNA made the request, no one at CNA knew that Plaintiff was transitioning from male to female. (Doc. 38-1 at 31:1–21; Doc. 39-1 at 32:1–6). Craig Meadors, Vice President of Enterprise Operations at CNA and the individual who made the request to remove Plaintiff, understood that Plaintiff may not be removed from the account immediately but requested that she only work in a support role without customer interaction while Defendant implemented her removal. (Meadors Dep., Doc. 52-9, at 50:2–15; Doc. 51-28 at 3).

Hutchison communicated CNA's request to McEvoy and Human Resources Business Partner Allison Delimon, (Doc. 52-6 at 146:20–147:23; *see also* Doc. 51-28 at 1), and McEvoy and Hutchison discussed Defendant's options, (Doc. 52-6 at 146:6–8). Removing the CNA account from Plaintiff's portfolio left Plaintiff with an insufficient workload. (*Id.* at 156:23–157:5; *see also* Doc. 52-4 at 228:1–11). In light of Plaintiff's significantly reduced workload, plus her performance

and behavioral issues, (Doc. 52-6 at 146:10–19, 151:22–153:11, 160:15–18; Doc. 52-8 at 7:18–8:6, 63:4–6; *see also* June 26, 2014 E-mail, Doc. 51-29), Hutchison and McEvoy recommended terminating Plaintiff to Delimon, who endorsed their recommendation, (Doc. 52-6 at 147:13–23; Doc. 52-8 at 8:10–13). On June 27, 2014, Plaintiff was terminated. (*See* Doc. 51-29).

As a result of her termination, Plaintiff filed this lawsuit asserting claims for sex discrimination, disability discrimination, sexual harassment, and retaliation in violation of her rights under both state and federal law. However, in her Response to Defendant's Motion for Summary Judgment on all claims, Plaintiff has indicated her intention to abandon all claims for sexual harassment and disability discrimination. Therefore, the Court will deem those claims waived without further discussion.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories,

and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

### III.   ANALYSIS

### A.   Sex Discrimination

Plaintiff alleges that she was discriminated against based on her sex, in violation of Title VII and the Florida Civil Rights Act ("FCRA"). Specifically, Plaintiff argues that she was terminated because she is transgender. "Title VII declares unlawful any 'employment practice' that 'discriminate[s] against any individual with respect to . . . compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 884 (11th Cir. 2016) (per curiam) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Sex discrimination includes discrimination against a transgender person for gender nonconformity." *Id.* (citation omitted). "Discrimination claims, whether brought under Title VII, [§] 1981, or the FCRA, are subject to the same standards of proof and employ the same analytical framework." *Walters v. McDonald*, No. 2:14-cv-602-FtM-29MRM, 2016 WL 4079982, at *4 (M.D. Fla. Aug. 1, 2016). Accordingly, this Court will address Plaintiff's claims for sex discrimination in violation of Title VII and in violation of the FCRA together.

"Discrimination claims brought under Title VII . . . are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235

(11th Cir. 2016). For both types of claims, "a plaintiff may use either direct or indirect evidence to show that her employer discriminated against her because of her sex." *Chavez*, 641 F. App'x at 884. Plaintiff has presented circumstantial evidence that she was discriminated against. *See Quigg*, 814 F.3d at 1236 (noting that the plaintiff relied on circumstantial evidence where the evidence suggested but did not prove a discriminatory motive). Normally, "[t]here is more than one way to show discriminatory intent using indirect or circumstantial evidence." *Chavez*, 641 F. App'x at 885 (quotation omitted). The first method is through the *McDonnell Douglas* burden-shifting framework. *Id. See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973). The second method is by "presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Chavez*, 641 F. App'x at 885 (quotation omitted).

However, the Eleventh Circuit has recently held that "*McDonnell Douglas* is not [the] appropriate [framework] for examining mixed-motive claims at summary judgment." *Quigg*, 814 F.3d at 1239. This is because a plaintiff "can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was *a* motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Id.* at 1235 (emphasis added) (quoting 42 U.S.C. § 2000e-2(m)). However, under *McDonnell Douglas*, "if an employee cannot rebut her employer's proffered reasons for an adverse action but offers evidence demonstrating that the employer also relied on a forbidden consideration, she will not meet her burden." *Id.* at 1238. "Yet, this is the exact type of employee that the mixed-motive theory of discrimination is designed to protect." *Id.* Accordingly, the *McDonnell Douglas* framework is too demanding and inapplicable in a Title VII discrimination case where the plaintiff brings a mixed-motive claim and is trying to survive summary judgment.

Plaintiff argues that summary judgment should be denied under both analytical frameworks. Yet Plaintiff asserts that she "may prevail if she proves that her sex was a 'motivating factor' behind her termination, even if there were other, even legitimate, factors motivating that decision as well." (Doc. 49 at 20 (quotation omitted)). Thus, it appears that Plaintiff has brought a mixed-motive claim, and therefore, *McDonnell Douglas* is not the proper analytical framework. Rather, to survive summary judgment, Plaintiff need only present adequate evidence to convince a jury that "(1) [D]efendant took an adverse employment action against [P]laintiff; and (2) a protected characteristic was *a* motivating factor for [D]efendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (quotation omitted).

Under this test, the analysis is the same as that previously articulated by the Eleventh Circuit in Title VII discrimination cases where only circumstantial evidence is presented. *Id.* at 1240. That is, "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)); *see also id.* ("[T]he crux of the analysis at the summary judgment stage is whether the plaintiff has offered sufficient evidence to establish a genuine issue of discrimination."). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (quotation and footnote omitted).

It is undisputed that Plaintiff's termination constitutes an adverse employment action. *See Spencer v. EZ Title Pawn, Inc.*, 7:14-cv-32 (HL), 2016 WL 1259409, at *14 (M.D. Ga. Mar. 30, 2016). Thus, the Court need only determine if there is a triable issue as to whether Plaintiff's sex was a motivating factor for her termination.

As evidence of discrimination, Plaintiff alleges that Hutchison's behavior changed after she learned that Plaintiff was transgender. Among the various behavioral changes Plaintiff points to, she alleges that Hutchison made discriminatory comments to her.[3] Plaintiff testified that Hutchison said to Plaintiff, "Oh, I know, you think you're a woman," approximately six times, beginning in late 2013, (Doc. 52-4 at 253:6–7, 254:9–17), and that she called Plaintiff a "whiny little . . ." once in late 2013 or early 2014, (*id.* at 255:5–14). Additionally, Hutchison asked Plaintiff when she was transitioning one time in either January or February of 2014 and became angered when Plaintiff refused to answer. (*Id.* at 255:18–256:5). Plaintiff also testified that Hutchison spoke to Plaintiff in a high-pitched tone, mocking Plaintiff's efforts to speak with a more feminine sounding voice, two or three times. (*Id.* at 256:6–12). Furthermore, Plaintiff testified that Hutchison expressed her desire to terminate Plaintiff in March 2014 and stated that "apparently D&B doesn't want to lose Tom Gersbach's big brain." (*Id.* at 248:17–25). Plaintiff also alleges that in a group meeting, Hutchison once told Plaintiff that she did not understand "Sales 101." (*Id.* at 112:2–22, 120:11–19). Although Hutchison denies making these comments, the Court assumes Plaintiff's testimony is true for the purposes of ruling on Defendant's summary judgment motion.

"Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), *superseded by statute*, 42 U.S.C. § 2000e-2. Rather, "[t]he plaintiff must show that the employer actually relied on her [gender-nonconformity] in making its decision." *Id.* "In making this showing, stereotyped remarks can certainly be evidence that [one's gender-nonconformity] played a part." *Id.* (emphasis omitted). However, "sporadic use of abusive language, gender-related

---

[3] Plaintiff argues that Hutchison's decision to inform her supervisor about Plaintiff's gender identity is discrimination *per se*. However, given that Plaintiff's argument lacks citation to any legal authority, the Court rejects this argument.

jokes, and occasional teasing," which are simply part of the "ordinary tribulations of the workplace," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation omitted), are not evidence of discrimination and are not actionable under Title VII. *See also Burlington N. Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth a general civility code for the American workplace." (quotation omitted)).

Hutchison's comments fail to demonstrate how Plaintiff's sex contributed to Defendant's decision to terminate her. The sporadic comments allegedly made by Hutchison resemble "stray remarks." *Price Waterhouse*, 490 U.S. at 251. Additionally, Hutchison became aware of Plaintiff's transgender status around February 2013, but the purportedly discriminatory statements were made in late 2013 and early 2014. This considerable span of time indicates that Hutchison's comments were not motivated by a discriminatory animus. More importantly, Plaintiff was terminated in June 2014. Therefore, the comments were not made during Defendant's discussions regarding whether to terminate Plaintiff, nor is there a temporal nexus between the time the statements were made and the time Defendant decided to terminate Plaintiff. *See Quigg*, 814 F.3d at 1242 (denying summary judgment and noting, in part, that the discriminatory statements were made during conversations regarding whether the plaintiff should maintain her position as superintendent and that there was temporal proximity between the time the statements were made and the time the defendant decided not to renew the plaintiff's contract); *see also Price Waterhouse*, 490 U.S. at 251 (noting that comments about the plaintiff constituted circumstantial evidence of discrimination where the comments stemmed from sex-stereotypes and were an important consideration for the defendant in determining whether to promote the plaintiff). Accordingly, the comments on which Plaintiff relies would not allow a reasonable jury to infer that her gender was a motivating factor for her termination.

Plaintiff also argues that Hutchison engaged in a "sophisticated effort to make Plaintiff's job more difficult," (Doc. 49 at 19), which demonstrates Hutchison's significant gender bias towards Plaintiff. Plaintiff alleges that Hutchison "froze out" Plaintiff by not supporting Plaintiff, not visiting Plaintiff's customers, and not attending Plaintiff's meetings, proposals, and presentations.[4] Additionally, Plaintiff asserts that although someone working in Plaintiff's position was supposed to have a teammate working with them, Hutchison did not assign Plaintiff a teammate from October 2013 until May 2014 and that Hutchison would assign Plaintiff new accounts without informing her. It is undisputed, however, that Hutchison failed to assign Plaintiff a teammate for several months due to a hiring freeze. (*See* Doc. 52-6 at 90:18–92:22). Therefore, this failure does not allow for an inference of a discriminatory motive.[5]

It is unclear whether Hutchison's "freeze out" and assigning Plaintiff additional accounts without informing her constitutes evidence of a discriminatory animus. *See Cox*, 2014 WL 4417855, at *5 (noting that even if the defendant singled the "plaintiff out and treated her poorly . . . unless something links the actions to the employee's [sex] . . . that does not permit a jury to infer intentional discrimination based on [sex]" (quoting *Turner v. Fla. Prepaid Coll. Bd.*,

---

[4] Plaintiff also testified that Hutchison became abusive in her one-on-one telephone meetings with Plaintiff after she discovered that Plaintiff was having gender identity issues. (Doc. 52-4 at 174:5–9). But "[p]ersonal animosity is not the equivalent of sexual discrimination and is not proscribed by Title VII." *Capasso v. Collier Cty.*, No. 2:12-cv-499-FtM-38DNF, 2014 WL 5590695, at *8 (M.D. Fla. Nov. 3, 2014) (quoting *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986)); *see also Cox v. Worldpay US, Inc.*, No. 8:13-cv-668-T-36TBM, 2014 WL 4417855, at *5 (M.D. Fla. Sept. 8, 2014) (explaining that the fact that the plaintiff's supervisor was "badgering her about everything that he could that was negative and not offering any positive" and that the record was "rife with instances of personal animosity between the" plaintiff and her supervisor was insufficient to demonstrate that the plaintiff's gender was a contributing factor for her termination (quotation omitted)).

[5] Additionally, Plaintiff testified that she did receive assistance from other co-workers despite not having a specific teammate assigned to her. (Doc. 52-4 at 68:25–69:1, 183:14–20, 304:3–6). When the hiring freeze concluded, Hutchison hired Daryl Clark to work with Plaintiff. (Doc. 52-6 at 90:18–92:9).

522 F. App'x 829, 833 (11th Cir. 2013))). Here, the only link supplied by Plaintiff between Hutchison's behaviors and Plaintiff's sex is the fact that Hutchison's allegedly discriminatory actions occurred after she learned that Plaintiff was transgender.

Assuming, arguendo, that this timeline evinces a discriminatory animus on the part of Hutchison, the ultimate question before the Court is whether Hutchison's discriminatory animus was a motivating factor in the decision to terminate Plaintiff. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (stating that the Court's "sole concern is whether [an] unlawful discriminatory animus motivated" the defendant's decision to terminate (quotation omitted)). The record evidence leads the Court to conclude that no reasonable jury could infer that Hutchison's alleged discriminatory animus was a motivating factor for Plaintiff's termination.

The record makes clear that Plaintiff was terminated due to performance and behavioral problems and after CNA requested that Plaintiff be removed from its account. To the extent Plaintiff suggests that her poor sales performance—and thus, her termination—was due, in part, to a discriminatory "freeze out" by Hutchison, her allegations are merely conclusory. *See Spencer*, 2016 WL 1259409, at *11 ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of . . . intentional discrimination where an employer has offered extensive evidence of legitimate, nondiscriminatory reasons for its action." (quotation omitted)). Plaintiff's argument that Hutchison engaged in a discriminatory freeze out is devoid of any particular facts, such as specific meetings, proposals, and presentations led by Plaintiff that Hutchison failed to attend. Furthermore, Plaintiff neither mentioned a particular sales deal that she was unable to close nor a certain client relationship that suffered based on Hutchison's absence. Plaintiff also failed to provide the Court with any concrete information as to how her sales would have improved were she to have Hutchison's assistance and more thorough support. Moreover,

Plaintiff does not dispute the poor performance reviews that she received and testified that her being placed on a verbal warning due to her poor sales was warranted. As for the fact that Hutchison assigned several accounts to Plaintiff without Plaintiff's knowledge, those accounts were reassigned based on the needs of the business and were not up for renewal in the near future; thus, they required no immediate attention from Plaintiff. Again, Plaintiff does not offer any particular evidence to demonstrate that her poor performance reviews and low sales were due in part to Hutchison's failing to inform Plaintiff of her newly inherited accounts.

For the foregoing reasons, Plaintiff has failed to cast doubt on the objective and undisputed evidence before the Court regarding Plaintiff's poor performance reviews and sales records. There is nothing to indicate that Hutchison's discriminatory behaviors negatively affected Plaintiff's sales or caused her to receive poor performance reviews. It therefore follows that Plaintiff has not sufficiently shown that Hutchison's discrimination led to, or was a motivating factor for, her termination.

Plaintiff further argues that additional behaviors by Hutchison indicate that Hutchison's discriminatory animus was a motivating factor for Plaintiff's termination. Specifically, Plaintiff provides that Hutchison started a journal about Plaintiff; noted Plaintiff's use of eyeliner; and spoke with Plaintiff about her use of the more feminine version of her name, "Tomi," in work e-mails. However, the Court also finds this evidence unavailing for similar reasons as discussed above. Assuming, arguendo, that this evidence was sufficient to allow a reasonable jury to find that Hutchison had a discriminatory animus, Plaintiff nevertheless fails to establish a causal nexus between these allegedly discriminatory behaviors and Plaintiff's termination. In other words, based on the evidence presented by Plaintiff, a reasonably jury could not infer that Plaintiff's gender status was a motivating factor for her termination. *See Stimpson v. City of Tuscaloosa*, 186 F.3d

1328, 1331 (11th Cir. 1999) (refusing to evaluate the evidence of discriminatory animus that the plaintiff presented because "even assuming, *arguendo*, that [the plaintiff] introduced sufficient evidence to allow a reasonable jury to find discriminatory animus," there was no causal link between the animus and her termination). This is especially true given that the overwhelming evidence demonstrates that Plaintiff was fired due to performance issues, behavioral problems, and after the Defendant's largest client asked that she be removed from its account. Having failed to present the Court with a sufficient causal link between her termination and Hutchison's discriminatory animus, as allegedly established by the aforementioned behaviors, Plaintiff's claim must fail.

Notably, Plaintiff's evidence focuses on purportedly discriminatory behaviors demonstrated by Hutchison. As previously discussed, the evidence concerning Hutchison's conduct is insufficient to create an inference that a motivating factor for Plaintiff's termination was her sex. Moreover, Hutchison was not the sole decision-maker. Rather, Hutchison and McEvoy made the recommendation to terminate Plaintiff to the HR Business Partner, Allison Delimon, who confirmed the recommendation. Plaintiff has failed to provide any evidence that either McEvoy or Delimon discriminated against Plaintiff.[6]

Plaintiff attempts to cast doubt on Defendant's proffered reasons for terminating Plaintiff to demonstrate a discriminatory motive. Specifically, Plaintiff notes that (1) Meadors and Schram of CNA do not recall requesting that Plaintiff be immediately removed, (2) Defendant's answers to interrogatories regarding why Plaintiff was terminated are vague, (3) Defendant could have

---

[6] Although McEvoy testified that it was surprising to see a man with long hair in Defendant's work environment, (Doc. 52-8 at 72:14–16), this comment is not discriminatory, nor does it lead to an inference of intentional discrimination. McEvoy also testified that he was unaware that Plaintiff was transitioning. (*Id.* at 72:4–8). And Plaintiff was never reprimanded or questioned about having longer hair. (*See id.* at 72:24–73:8).

rebalanced its portfolios or rehired Plaintiff in an identical position, which had an opening, (4) Plaintiff was offered salary continuation benefits consistent with an employee that was terminated for reasons other than performance, and (5) Defendant did not follow its progressive disciplinary policy. The Court finds that Plaintiff's arguments are without merit.

Plaintiff's evidence, which she avers demonstrates the inconsistencies and weaknesses in Defendant's reasons for terminating Plaintiff, does not allow for an inference of discrimination. To the contrary, the undisputed record evidence clearly establishes that Plaintiff was terminated due to performance and behavioral issues and after she was asked to be removed from the CNA account.[7] That Meadors and Schram did not recall requesting that Plaintiff be *immediately* removed from the CNA account is of no import. What Defendant decided to do with CNA's request, and how quickly Defendant acted based on this information, is not for this Court to second guess. *See Alvarez*, 610 F.3d at 1266 ("We do not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."). Similarly, while Plaintiff takes the position that it was possible for Defendant to rebalance its portfolios or rehire Plaintiff in an identical position, a plaintiff is not permitted to "substitute his business judgment for that of the employer." *Johnson v. Young*, 4:15cv543-RH/CAS, 2016 WL 4536406, at *4 (N.D. Fla. Aug. 30, 2016) (quotation omitted). Defendant indicated that although it was possible to rebalance portfolios, it made the decision to terminate Plaintiff over the other available options due to Plaintiff's performance and behavior issues. (*See* Doc. 52-8 at 60:20–22).

---

[7] Accordingly, despite Plaintiff's argument, Defendant's answer to interrogatory number six, which states that "Plaintiff was terminated because of her unsatisfactory performance, unprofessional behavior and inappropriate conduct in the workplace," (Def.'s Answers to Interrogs., Doc. 51-5, at 6), is not suggestive of discrimination. Rather, Defendant's response squares with the undisputed record evidence.

McEvoy further testified that Defendant did not make changes to portfolio assignments very often because reassigning sales executives to different accounts was "extremely disruptive to the customers" and to the relationships. (*Id.* at 21:13–21). Accordingly, Plaintiff's argument that Defendant had options, other than terminating Plaintiff, is unpersuasive. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." (quotation omitted)); *Burrows v. Coll. of Cent. Fla.*, No. 5:14-cv-197-Oc-30PRL, 2015 WL 4250427, at *3 (M.D. Fla. July 13, 2015) ("It is not for this Court to second-guess the decisions of [the d]efendant regarding what is most supportive of [the d]efendant's 'core mission.'").

Additionally, that Plaintiff was offered salary continuation benefits consistent with an employee that was terminated for reasons other than performance does not carry the day. None of the individuals that were responsible for making the decision to terminate Plaintiff played a role in determining the type of salary continuation benefits Plaintiff would receive, and "there is no evidence that discrimination played a role in [the] alleged procedural irregularit[y]." *Burrows*, 2015 WL 4250427, at *7 (quotation omitted).

Finally, Plaintiff asserts that Defendant failed to follow its progressive disciplinary policy. Failure to follow a disciplinary policy can create an inference that discriminatory animus was a motivating factor in some circumstances. *See Chavez*, 641 F. App'x at 892. *But see Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."). Here, however, Defendant followed its progressive disciplinary policy, formally titled "Performance Improvement Policy." The Performance Improvement Policy includes two steps—a written warning and a final warning.

(Performance Improvement Policy, Doc. 51-27, at 1). Notably, the policy explicitly states under "Exceptions to Policy" that "[a]s outlined in the Team Member Terminations Policy, there are occasions where performance improvement steps may not be necessary. The responsibility for determining these exceptions is a collaborative effort of the immediate leader, the HR Business Partner and the next level of management." (*Id.* at 2). Clearly, both Defendant's Team Member Terminations Policy and Performance Improvement Policy contemplated that employees could be fired without following the two-step process. Prior to termination, Plaintiff received a written warning, and Plaintiff's immediate leader, Hutchison; HR Business Partner, Delimon; and the next level of management, McEvoy, decided to terminate Plaintiff without first issuing a final warning. Thus, Defendant terminated Plaintiff pursuant to the applicable exception in its Performance Improvement Policy and as provided in its Team Member Terminations Policy, and no inference of a discriminatory motive can be drawn.

Particularly telling—and detrimental—for Plaintiff's case is the fact that when Plaintiff was questioned as to what evidence she had to support that she was terminated because of sex-based considerations, Plaintiff testified that it was her "belief" that her termination was related to being transgender and that she "k[new] in [her] heart what happened."[8] (Doc. 52-4 at 258:14–24). Plaintiff's "'generalized feelings' are not sufficient to permit a reasonable jury to find that an illegal bias played a role in Defendant's termination decision." *Vinson v. Koch Foods of Ala., LLC*, No. 2:12-cv-01088-BJR-SRW, 2016 WL 7013474, at *13 (M.D. Ala. Nov. 29, 2016) (citing *Spencer*, 2016 WL 1259409, at *14 (holding that the plaintiff's "conclusory allegations that [the

---

[8] Plaintiff also testified that it was her belief that Defendant terminated her based on her gender because she was terminated only two weeks before President Obama signed legislation prohibiting any company with federal contracts, like Defendant, from discriminating against transgendered individuals. However, Plaintiff admitted that this was "only [her] speculation." (Doc. 52-4 at 260:20).

d]efendant discriminated against him" were insufficient "to permit a reasonable jury to find that an illegal bias played a role in [the d]efendant's decision to terminate him")); *see also id.* ("What is significant is that [the p]laintiff can point to nothing that suggests that [the p]laintiff's [sex] was a motivating factor in her termination.").

Viewing the evidence in a light most favorable to Plaintiff, this Court concludes that there is insufficient circumstantial evidence to create a triable issue regarding whether Plaintiff's sex was a motivating factor for her termination. Therefore, summary judgment will be granted in Defendant's favor on Counts I and IV.

### B. Retaliation

Plaintiff alleges that she was retaliated against after she complained of being discriminated against based on her sex, in violation of Title VII and the FCRA. "Title VII and the FCRA prohibit retaliation against an employee for opposing a discriminatory employment practice or for participating in an investigation or proceeding concerning employment discrimination." *Burrows*, 2015 WL 4250427, at *10 (citing 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7)). As previously discussed, "federal law construing Title VII applies to the FCRA." *Id.* at 5 n.4. Thus, Plaintiff's claims for retaliation in violation of Title VII and the FCRA will be analyzed together.

Where there is no direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies. Plaintiff must first establish a prima facie case of retaliation, which requires a showing that: (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally related to the protected activity. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013). If the plaintiff establishes a prima facie case, the defendant has the opportunity to rebut the presumption of discrimination previously established by the plaintiff. *See Tex. Dep't of Cmty. Affairs v. Burdine*,

450 U.S. 248, 254–56 (1981). That is, "the burden then shifts to [the d]efendant to articulate some legitimate, nondiscriminatory reason for the employment action." *Burrows*, 2015 WL 4250427, at *5. Then, the plaintiff must "show that [the d]efendant's proffered, legitimate, nondiscriminatory reason is pretextual." *Id.*

The parties dispute whether Plaintiff has established a prima facie case. As for the first prong, Plaintiff engaged in statutorily protected activity. "[I]t is well established that Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'" *O'Hara v. Univ. of W. Fla.*, 750 F. Supp. 2d 1287, 1311 (N.D. Fla. 2010) (quoting *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002)), *aff'd in part*, 494 F. App'x 972 (11th Cir. 2012). "However, the statute's protections only reach individuals who explicitly or implicitly communicate a belief that the practice constitutes unlawful employment discrimination." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). On April 22, 2013, Plaintiff wrote an e-mail to Hutchison stating, "I am also concerned that your public humiliation behavior may be related to your knowledge of my being a gender confused Transsexual on hormones for the last couple of years." (Doc. 40-1 at 90). On June 19, 2013, Plaintiff also forwarded e-mails to Wiklund to voice concerns that Hutchison was making things difficult for her because of her gender status. (*See* Doc. 51-20 at 1 ("I continue to feel [her behavior is] relative to her knowledge of my gender status . . . ."); Doc. 51-21 at 1). Plaintiff's e-mails to Hutchison and Wiklund were informal complaints to her superiors that she was being discriminated against because she is transgender and thus constitute statutorily protected activity.

At the outset, it seems that Plaintiff has also established that she suffered an adverse employment action—she was terminated. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439

F.3d 1286, 1298 (11th Cir. 2006). However, because Plaintiff complained of Hutchison's discriminatory conduct in April and June of 2013 and was not terminated until June of 2014, she cannot establish that her termination was causally related to her protected activity without additional evidence of retaliation. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough [to establish causation]."). Therefore, Plaintiff asserts that her adverse employment action included a series of adverse employment actions, culminating in her termination.

"[A] set of actions may constitute an adverse employment action when considered collectively, even though some actions do not rise to the level of an adverse employment action individually." *Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 952 (11th Cir. 2015). As evidence of an adverse employment action, Plaintiff asserts that she suffered from the following: (1) discriminatory comments made by Hutchison regarding Plaintiff's gender, (2) a "freeze out" of Plaintiff, (3) Hutchison's failure to provide Plaintiff with a teammate, (4) Hutchison's adding and removing clients from Plaintiff's portfolio without Plaintiff's knowledge, (5) lower performance scores, (6) a reprimand and written warning with regards to a matter that was not investigated by Defendant, (7) Hutchison's March 2014 comment that she wanted Plaintiff terminated, and (8) Hutchison's dismissive behavior, as alleged by Daryl Clark. The Court need not determine whether these actions collectively qualify as an adverse employment action because, assuming they do, Plaintiff has nevertheless failed to demonstrate a causal connection between her protected activity and this series of events.

"[A] plaintiff making a retaliation claim under [42 U.S.C.] § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Causation may be proven "by demonstrating that the protected activity and the materially adverse action were not completely unrelated." *Perry v. Rogers*, 627 F. App'x 823, 831–32 (11th Cir. 2015) (quotation omitted). While "[c]lose temporal proximity between the protected activity and the materially adverse action can satisfy the causation element . . . mere temporal proximity, without more, must be very close." *Id.* (quotation omitted). "Thus, when a plaintiff relies on temporal proximity alone, a substantial delay between the protected expression and the materially adverse action will result in the failure of the retaliation claim." *Id.* Courts have held that a three-month gap between the protected activity and the materially adverse action is insufficient to establish causation. *Thomas*, 506 F.3d at 1364 (collecting cases).

In opposing summary judgment, Plaintiff failed to present evidence from which a reasonable jury could find that there was any causal connection between her April and June 2013 complaints and the series of events which she argues constitutes an adverse employment action. Plaintiff merely sets forth the conclusory statement that "a reasonable jury could find that Plaintiff's protected activity was the factor that made a difference and set in motion the chain of events . . . culminating in Plaintiff's termination." (Doc. 49 at 25). Despite Plaintiff's failure, after a thorough examination of the evidence, the Court concludes that no causal connection exists.

In a Title VII retaliation case, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Here, all of the adverse actions alleged involve Hutchison as the "decision-maker." Because Plaintiff has not shown that Hutchison was aware of Plaintiff's June complaint to Wiklund, April 22, 2013, the day Plaintiff complained to Hutchison via e-mail will serve as the measuring date for causation purposes.

Plaintiff asserts that Hutchison made discriminatory comments beginning in late 2013 and early 2014, left Plaintiff without a teammate beginning in October 2013, commented that she desired to terminate Plaintiff in March of 2014, unnecessarily reprimanded and gave Plaintiff a written warning in April 2014, and was dismissive of Plaintiff, as alleged by Daryl Clark, who was not hired until April 2014. None of the foregoing occurred within three to four months of Plaintiff's April complaint, and therefore, no temporal nexus exists to support a finding of causation with respect to these actions. Moreover, the evidence indicates that Hutchison's alleged freeze out and failure to inform Plaintiff of her newly assigned accounts began before Plaintiff complained to Hutchison in April. (*See* Doc. 52-4 at 174:10–13, 174:23–175:8, 177:7–22; Doc. 40-1 at 90 (stating in Plaintiff's April 22, 2013 e-mail to Hutchison, wherein Plaintiff complained to Hutchison that she believed she was being discriminated against, that Hutchison had previously assigned Plaintiff new accounts without informing her of the same)). As a result, Plaintiff has also failed to establish causation between Plaintiff's protected activity and these actions. *See Trigo v. City of Doral*, No. 15-14657, 2016 WL 6135233, at *2 (11th Cir. Oct. 21, 2016) ("When an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." (emphasis omitted)); *see also Smith v. Mobile Shipbuilding & Repair, Inc.*, No. 16-10321, 2016 WL 5750845, at *4 (11th Cir. Oct. 4, 2016) ("[T]he plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." (quotation omitted)).

In fact, the only event within the sequence that satisfies the temporal nexus requirement is the mid-year performance review that Plaintiff received in July of 2013. But this review clearly does not constitute a materially adverse action. Although Plaintiff received lower scores in this

review than in previous reviews, no disciplinary action was taken, nor was Plaintiff denied eligibility for a pay raise based on this poor review. *See Harris*, 611 F. App'x at 952 (noting that "an employee suffers a materially adverse action when [s]he receives an unfavorable performance review that affects h[er] eligibility for a pay raise" but not when the memorandum fails to indicate that any disciplinary action was taken based on the plaintiff's failure to perform her job duties sufficiently). Accordingly, despite its temporal proximity to Plaintiff's April complaint, Plaintiff's 2013 mid-year performance review does not support Plaintiff's claim for retaliation. Nor does this single showing of a temporal nexus lead the Court to conclude that Plaintiff has established causation as to the entire sequence of events that Plaintiff argues qualify as a materially adverse action.

Having failed to establish the requisite causal connection, Plaintiff cannot demonstrate a prima facie case of retaliation. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims for retaliation, Counts III and IX.

## IV.   CONCLUSION

Therefore, it is **ORDERED** and **ADJUDGED** as follows:

1.   Defendant's Motion for Summary Judgment (Doc. 32) is **GRANTED**.

2.   Defendant's Motion in Limine (Doc. 56) is **DENIED as moot**.

3.   The Clerk is directed to enter a judgment in favor of Defendant and against Plaintiff. Thereafter, the Clerk shall close this case.


**DONE** and **ORDERED** in Orlando, Florida on January 24, 2017.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record